Thomas E. McDermott, OSB #762430
Tyson L. Calvert, OSB #032809
**LINDSAY HART, LLP**
900 SW 5th Ave, Suite 2700
Portland, OR 97204-1206
tmcdermott@lindsayhart.com
tcalvert@lindsayhart.com
Telephone: 503.226.7677
Facsimile: 503.226.7697

*Attorneys for Plaintiffs and the Requested Class*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| **NICK L. ADAMS** and **GREGORY J. LEIJON**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>**MEKETA INVESTMENT GROUP, INC.,**<br><br>Defendant. | Case No.<br><br>**COMPLAINT - CLASS ACTION,** Breach of Fiduciary Duty, Third Party Beneficiary Breach of Contract<br><br>***JURY TRIAL DEMANDED*** |

## I.
## NATURE OF THE CASE & OVERVIEW

> ***"The primary objective of [the Oregon Public Employees Retirement] Fund is to make investments for the sole interest of the participants and beneficiaries of the Fund."***[1]

---

[1] *Investment Policy Statement for Oregon Public Employees Retirement Fund,* adopted – April 17, 2024, p. 10. (Emphasis added).

1. Plaintiffs Nick L. Adams and Gregory J. Leijon (collectively "Plaintiffs") allege the following for their class action complaint against Defendant Meketa Investment Group, Inc. ("Meketa"). Plaintiffs' allegations are based on personal knowledge as to themselves and their acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

2. This case arises from the wrongful acts and inactions of expert financial consultant Meketa with respect to the funds held in trust for the members of the Oregon Public Employees Retirement System (OPERS). OPERS administers a cost-sharing, multiple-employer defined benefit pension plan for units of Oregon state government, political subdivisions (including community colleges and school districts), and public universities. Meketa owes fiduciary duties directly to the members of the retirement system (including the Plaintiffs and Class Members), and those fiduciary duties include the obligation to "make the moneys [held in OPERS] as productive as possible." ORS § 293.721.

3. Meketa's actions and inactions have injured the Plaintiffs and Class Members' opportunity to have the full 6% of their mandatory salary contributions credited to their individual defined contribution-type accounts, rather than having a portion of those contributions redirected to fund a benefit to which they were and are already entitled.

4. Each of the Plaintiffs is an Oregon public employee who is an active, contributing member of Oregon's Public Employees' Retirement System (PERS).

/ / /

/ / /

/ / /

/ / /

5. PERS' members defined benefit retirement funds are held in the Oregon Public Employees Retirement Fund ("OPERF" or the "Fund"). As of December 31, 2025, OPERF was valued at approximately $101 billion.[2]

6. The OPERF Fund is held in trust for PERS members, and responsibility for investing the funds rests with the Oregon Investment Council (OIC), on the advice and assistance of professional investment consultants that the OIC retains, and the assistance of State Treasury Staff. *See* ORS § 293.741.

7. Unlike a private retirement plan (i.e., a 401(k) or similar), PERS members have no ability to direct or control how any of their defined benefit retirement funds are invested, so they are unable to choose whether to invest in cautious investments or in riskier, more expensive investments. PERS members are thus wholly dependent on others, who are bound by their fiduciary duties, to treat PERS members fairly, diligently, and honestly.

## II.
## OPERF'S OUTLIER ALLOCATION PERCENTAGES

8. When compared to other public pension plans across the country, OPERF's investment portfolio has an unusually high percentage of riskier "alternative" investments (i.e., hedge funds, private equity funds, and the like), and an unusually low percentage of public investments (i.e. publicly-traded stocks and bonds, etc.).

9. The chart identified as *Figure A* below (based on financial data prepared by Meketa) sets forth the categories of investments in which OPERF was invested as of December 31, 2025, the percentage of the entire portfolio that each category occupies, and the dollar value of each category:

---

[2] *See Meketa's OPERF Fourth Quarter Performance Report*, p. 25.

*Figure A*

| Investment Category | Percentage | Dollar amount |
|---|---|---|
| Public Equity | 22.1% | $22,423,210,941.00 |
| Fixed Income | 18.2% | $18,400,217.846.00 |
| Private Equity | 24.7% | $25,005,287,762.00 |
| Real Estate | 13.4% | $13,532,760,586.00 |
| Real Assets | 10.6% | $10,758,008,302.00 |
| Diversifying Strategies | 5.4% | $5,479,402,959.00 |
| Opportunity Portfolio | 2.8% | $2,846,051,571.00 |
| Cash Overlay | 2.2% | $2,207,217,284.00 |
| TOTALS | 99.4% | $101,338,832,752.00[3] |

10. *Figure B* below is based on the audited financial statements presented by OPERF in its Annual Comprehensive Financial Report, p. 64, which contain this information as of June 30, 2025:

*Figure B*

| Investment Category | Percentage | Dollar amount |
|---|---|---|
| Public Equity | 25.21% | $26,553,047,903.00 |
| Fixed Income | 19.04% | $20,055,875,505.00 |
| Private Equity | 24.89% | $26,214,179,797.00 |
| Real Estate | 13.23% | $13,934,158,825.00 |
| Real Assets | 10.22% | $10,767,603,966.00 |
| Diversifying Strategies | 4.78% | $5,037,297,094.00 |
| Opportunity Portfolio | 2.62% | $2,760,035,985.00 |
| Cash Overlay | 0 | $0 |
| TOTALS | 100.00% | $105,322,199,075.00[4] |

/ / /

[3] The information in this chart is compiled from *Meketa's OPERF Fourth Quarter Performance Report*, pp. 35-37.

[4] The dollars contained in this chart are compiled from *Oregon PERS Annual Comprehensive Financial Report* for the Fiscal Year Ended June 30, 2025, p. 64. (The percentage computations were not included in this Report; they were prepared by counsel.)

11. *Figures A* and *B* show several important things. First, as of both June 30, 2025 and December 31, 2025, **OPERF held well over half its assets in private market investments: 55.74% at June 2025 and 56.6% at December 2025**.[5]

12. Second, *Figures A* and *B* show OPERF's **private equity** holdings were 24.89% of its portfolio as of June 30, 2025 and 24.7% of its portfolio as of December 31, 2025. These percentages are more than ***double*** the average percentage (11.2%) that other public retirement systems hold in private equity investments.[6]

13. Third, *Figures A* and *B* show that OPERF's **public equity** holdings were 25.21% of its portfolio at June 30, 2025 and 22.1% of its portfolio at December 31, 2025. These figures are just over ***half*** the average holding (38.0%) that other public retirement systems invest in public equity.[7]

14. As alleged and explained here, OPERF's high percentage holdings in private equity and its low percentage holdings in public equity are unconventional.

/ / /

/ / /

---

[5] At June 30, 2025, OPERF held 24.89% in private equity + 13.23% in real estate + 10.22% in real assets + 4.78% in diversifying strategies + 2.62% in opportunity portfolio. At December 31, 2025, it held 24.7% in private equity + 13.4% in real estate + 10.6% in real assets + 5.4% in diversifying strategies + 2.8% in opportunity portfolio.

[6] The National Conference on Public Employee Retirement Systems (the largest trade association for public pensions in the United States and Canada), conducts an annual survey among public retirement systems of all sizes. Based on the 149 responses it received for the 2025 period, the average public retirement system allocated 11.2% of its investments to private equity. *NCPERS Public Retirement Systems Study Trends in Fiscal, Operational, and Business Practices – 2026 Edition*, p. 21.

[7] *Id.*

15. It is now evident that, since at least 2020, this outlier allocation has caused OPERF's investment returns to perform poorly and to post sub-standard returns. This is especially true as to its private equity portfolio (which comprises about 25% of OPERF's entire holdings).

16. As shown in *Figure C,* as of June 30, 2026, the Oregon State Treasury reported OPERF's actual **net annualized performance returns** for each of the following investment categories for each of the following periods:

*Figure C*

| | **1 year** | **3 yrs** | **5 yrs** | **10 yrs** |
|---|---|---|---|---|
| *Total OPERF regular account* | 8.6% | 7.4% | 6.3% | 8.4% |
| Public Equity (domestic) | 24.2% | 20.0% | 11.8% | 14.1% |
| Public Equity (international) | 26.6% | 20.4% | 10.9% | 11.8% |
| **Private Equity** | **1.2%** | **4.8%** | **7.0%** | 12.0%[8] |

17. Thus, OPERF's combination of holding its private equity at roughly double the average of other retirement systems, and holding its public equity at roughly half the average of other retirement systems has consistently resulted in OPERF generating reduced investment returns.

18. Indeed, as publicly reported in October 2025 by the Reason Foundation, for fiscal year 2024 (July 1, 2023-June 30, 2024), Oregon PERS' investment returns overall were 5.8%—

/ / /

/ / /

/ / /

[8] Data taken from: https://www.oregon.gov/treasury/invested-for-oregon/pages/performance-holdings.aspx (2026 2Q Fund Fact Sheet)

the fourth-lowest returns of any public pension system.[9] In fact, for fiscal 2024, Oregon PERS was among only six public pension systems in the country that posted annual returns under 6%.[10]

## III.
## CONTEMPORANEOUSLY-AVAILABLE INFORMATION ABOUT HOW OPERF'S PRIVATE INVESTMENTS PERFORMED WAS CAMOUFLAGED

19. It was not contemporaneously evident to Plaintiffs and Class Members that OPERF's private investments (and its private equity holdings in particular) were performing poorly. Newsletters provided to Members, issued between 2020 and 2025, emphasized the performance of OPERF's portfolio as a whole, but camouflaged the abysmal performance of the private equity portfolio by not addressing it directly. The information available was objectively inconsistent, confusing, and misleading.

20. Even exercising reasonable diligence, it was almost impossible for Plaintiffs and Class Members (most of whom have no training in alternative investments) to determine how OPERF's private equity investments were performing.

21. The following information appears in the online January 22, 2025 minutes of the Oregon Investment Council, addressing the returns of OPERF's private equity portfolio for the 2024 year in review: "**OPERF's Private Equity 2024 returns trailed 32.0% in the short-term and underperformed the benchmarks for the 3-year and 5-year periods by -10.8% and –**

/ / /

/ / /

---

[9] *See The Public Pension Plans with the Most Debt, Best and Worst Investment Return Rates*, Reason Foundation, Oct. 30, 2025, available here: https://reason.org/data-visualization/pension-plans-debt/

[10] *Id.*

**6.3%, respectively**."[11] (Note that this information was not located on Oregon's PERS website, itself).

22. Likewise, the January 21, 2026 minutes of the Oregon Investment Council (addressing the 2025 performance of OPERF's **private equity portfolio**) stated: "**Returns trailed the policy benchmark on the 1, 3, 5 and 10-year periods.**"[12]

23. Most recently, the Executive Summary contained in OPERF's Second Quarter 2026 Performance Report (prepared by Meketa and dated September 2, 2026) addressed the impact of the private equity portfolio as follows:

> → OPERF returned 3.5% for the quarter, **lagging most peers and its benchmark as its lower public equity exposure tempered participation in strong equity market gains**.
>
> • Most asset classes generated positive returns in Q2. Public Equity, Real Assets, and the Opportunity Portfolio led quarterly gains, while **Private Equity was the only major category to decline**, reflecting valuation adjustments reported during the quarter.
>
> → Over the trailing one-year period, the Total Fund returned over 8%, with positive returns across all asset classes.
>
> • **Private Equity and the Opportunity Portfolio were the primary detractors** to relative performance over the trailing one-year period, with benchmark-relative results varying across the broader portfolio.
>
> → **Asset allocation detracted from relative performance over the trailing quarter and one-year periods, driven primarily by an underweight to Public Equity**. Private Equity manager selection was favorable during the quarter but remained a headwind over the trailing one-year period. (page 27 of 65; Emphasis added).

---

[11] OIC Meeting Minutes, January 22, 2025, p. 3.

[12] OIC Meeting Minutes, January 21, 2026, p. 3.

## IV.
## MEKETA'S FIDUCIARY DUTIES RUN DIRECTLY TO THE PLAINTIFFS AND CLASS MEMBERS

24. Meketa Investment Group, Inc. holds itself out as an expert investment consultant that advises public pension plans about their investments.

25. Meketa was retained by the Oregon Investment Council (OIC) as of January 1, 2021, to provide investment guidance and expertise to the OIC. *See* ORS § 293.741 and OPERF's Investment Policy Statement.

26. The contract that Meketa signed with the OIC makes clear that Meketa assumed contractual fiduciary duties to the **members of the OPERF Fund (which includes the Plaintiffs and the Class Members)**:

> **8.3. Fiduciary Responsibility**. Consultant represents and warrants to Client that:
>
> **8.3.1. Prudent Expert Standard.** Consultant has the requisite experience, expertise and resources to fully and properly perform all of its duties and obligations set forth herein. Consultant represents itself as being possessed of greater knowledge and skill than the average person and is under a duty to exercise a skill greater than that of an ordinary person and the manner in which its performance hereunder is handled will be evaluated in light of Consultant's superior skill. **Consultant acknowledges it is a fiduciary under this Contract** and as a fiduciary it shall discharge each of its duties and exercise each of its powers, with the care, skill, prudence and diligence under the circumstances that a prudent expert acting in a like capacity and familiar with such matters would use in the conduct of any enterprise of like character with like aims.
>
> **8.3.2. Duty to the Fund. Consultant shall discharge its duties hereunder with respect to the Fund solely in the interest of the members, retirees and beneficiaries of the Fund**. Consultant shall not in any capacity: (a) act in any transaction involving the Fund on behalf of a party or represent a party whose interests are adverse to the interests of the Fund or its members and beneficiaries; or (b) receive any consideration for its personal account from any party dealing with the Fund in connection with a transaction involving the assets of the Fund.

[**EXHIBIT 1**, *Meketa 2021 Contract*]. (Emphasis by bold underline added).

27. Notwithstanding Meketa's "expertise," and its fiduciary duties to the "members, retirees, and beneficiaries of the fund," Meketa, as the OIC's primary general consultant, turned a

blind eye to the abysmal performance of OPERF's private markets investments, including, among other things, the 25% of the portfolio allocated to private equity investments. Meketa failed to timely recommend drastic changes to PERS' investment allocations to bring the allocations more in line with the allocation levels of other public pension funds. This failure caused OPERF to register only marginal investment performance during the period January 2021 to the present, which in turn negatively impacted the trajectory of investment returns for the following years.

## V.
## PLAINTIFFS AND CLASS MEMBERS' MANDATORY CONTRIBUTIONS TO THEIR RETIREMENT PLANS AND THE PARTIAL RE-DIRECTION OF THOSE CONTRIBUTIONS

28. Before 2004, PERS was a pure defined *benefit* pension plan, funded solely by its members' employers and by investment returns: PERS members were not required to contribute any funds to their retirement plan.

29. In 2004, the structure of PERS was modified to include both the defined *benefit* plan and a new defined *contribution* component. The Oregon Legislature created the individual account program (IAP) which required employees to contribute 6% of their own salary going forward into the new defined *contribution* plan.

30. The purpose of the 2004 modification was so that, when a PERS member became eligible for retirement, she would receive both: (a) a defined *benefit* pension benefit, and (b) the actual value of 100% of the contributions she made over the years toward her mandatory defined *contribution* plan.

/ / /

/ / /

/ / /

31. However, effective July 1, 2020, the Legislature implemented a new "member redirect" provision that began redirecting (siphoning off) a portion of the 6% salary contributions made by all plan employees (earning over a certain dollar threshold[13]) on earnings after that date.

32. Every dollar siphoned off by this "redirect" framework no longer went into a member's individual account program (IAP) as a defined ***contribution***. Instead, the siphoned dollars went into a new and different individual "Employee Pension Stability Account" (EPSA), to be used to pay the cost of that member's future defined ***benefit*** pension obligation; a benefit to which the member is already entitled.

33. The member redirect provision, as enacted, contained an important temporal provision. Specifically, the redirect provision is to be suspended for a two-year period, when "the funded status of the system" is 90 percent or greater. ORS § 238A.330(2)(c).

34. The information in *Figure D* below is taken from *PERS By the Numbers 2025*[14] and it shows that the PERS system's unfunded actuarial liability and funded ratio (both including side accounts[15]) was as follows on the below dates:

/ / /

---

[13] "If you earn more than the $2,535 a month in 2021, a portion of your 6% IAP contributions are now redirected into the Employee Pension Stability Account (EPSA)." April 2021 *Perspectives* Newsletter for OPSRP members.

[14] Data in chart available on the Oregon PERS website, at: https://www.oregon.gov/pers/Documents/General-Information/PERS-by-the-Numbers.pdf, p. 26.

[15] A "side account" is an employer-funded, interest-bearing pre-payment account established within the OPERFS fund. Employers make voluntary lump-sum deposits into these accounts to prepay a portion of their transition liabilities or unfunded actuarial liability (UAL). The deposited funds are invested by the Oregon State Treasury, and the resulting earnings and principal are used as an actuarial asset to offset and reduce the employer's monthly PERS contribution rates.

*Figure D*

| **Valuation Date** | Unfunded actuarial liability (including side accounts) | **Funded Ratio with side accounts** |
|---|---|---|
| **2020** | $22,900,000,000 | **76.0%** |
| **2021** | $13,400,000,000 | **86.0%** |
| **2022** | $21,800,000,000 | **79.0%** |
| **2023** | $24,000,000,000 | **77.0%** |
| **2024** | $24,800,000,000 | **77.2%** |

35. Accordingly, the redirection of member contributions began in fiscal year 2020 and has continued to date (because the funded status of the PERS system has not reached 90%).

36. Upon information and belief, one of the primary reasons that PERS' funded status has not yet reached 90% is the wrongful actions and inactions of Defendant Meketa.

37. If Meketa had competently performed its duties and obligations, the Fund's investments would have performed much better. If Meketa had made substantial and sustained recommendations that the investment allocations include substantially fewer private equity and other alternative investments, and substantially more public equity investments, the returns would have been substantially better.

## VI.
## ECONOMIC INJURY RESULTING FROM IMPAIRMENT OF THE OPPORTUNITY TO END MEMBER REDIRECTION

38. Meketa's actions and inactions have impaired a separate and identifiable economic interest of Plaintiffs and Class Members: their opportunity to have the full 6% of their mandatory salary contributions credited to their individual IAP accounts, rather than having a portion of those contributions redirected to their Employee Pension Stability Accounts (EPSAs).

39. The Oregon Legislature expressly linked the continuation of member redirection to the funded status of the PERS system. Under ORS § 238A.330(2)(c), when a qualifying rate-setting actuarial valuation establishes that the system has reached a funded status of at least 90%,

the full amount of members' mandatory contributions is to be credited to their IAP accounts during the following biennium (two-year period). Thus, the financial consequences at issue here extend beyond the value of the Fund itself—the performance level directly affects when Plaintiffs and Class Members may obtain the economic benefits of having their full mandatory contributions credited to their individual defined contribution accounts.

40. Meketa's fiduciary obligations included exercising prudent professional judgment in advising the OIC concerning investment allocation, investment performance, and the risks and costs associated with OPERF's investments. Upon information and belief, Meketa's failures to fulfill those obligations caused OPERF to achieve substantially lower investment returns than reasonably prudent investment advice and recommendations would have produced, thereby adversely affecting the funded status of the PERS system.

41. By adversely affecting the Fund's investment performance and funded status, Meketa's actions and inactions diminished the Plaintiffs' and the Class Members' opportunity to reach, at an earlier date, the statutory condition that would end the redirection of a portion of their mandatory contributions.

42. Meketa's wrongful conduct has impaired and diminished the Plaintiffs' and the Class Members' opportunity to achieve the 90% funded threshold sooner, thereby increasing the risk and likelihood that member redirection will continue for a longer period than would otherwise have been necessary.

43. The economic significance of this lost opportunity is substantial. For Tier One and Tier Two members, continued redirection results in 2.5% of their qualifying salary being credited to an EPSA rather than their IAP. For OPSRP members, the corresponding amount is 0.75% of qualifying salary. Contributions credited to an IAP are available to accumulate investment earnings

for the member's individual defined contribution retirement benefit, whereas contributions redirected to an EPSA are subject to materially different statutory treatment and generally are applied toward the future cost of the member's defined benefit pension. Thus, the continuation of redirection deprives members of the opportunity to accumulate those additional contributions, and their associated investment returns, in their IAP accounts.

44. The injury alleged is not merely an abstract concern about the future financial condition of OPERF. The member redirection is presently occurring, the amounts redirected from each member's IAP are ascertainable, and the statutory funding threshold governing the continuation of redirection is objectively defined.

45. Plaintiffs and Class Members have therefore suffered an impairment of a valuable economic opportunity arising from the statutory relationship between OPERF's funded status and the allocation of their mandatory retirement contributions.

## VII.
## THE PLAINTIFFS

46. Plaintiff **Nick L. Adams** is a resident of Gresham, Oregon, located in Multnomah County.

47. Mr. Adams is currently employed within the State of Oregon as a Custodian by the North Clackamas School District, and he has been so employed since 1998.

48. As a public employee, Mr. Adams is a contributing member in Oregon's Public Employees Retirement System (PERS), and his membership date is May 1, 1999.

49. Mr. Adams participates in the PERS defined benefit plan as a Tier Two member. Mr. Adams' 2025 Member Annual Statement shows 26 years, 8 months of total service credit.

/ / /

50. Mr. Adams is also a mandatory participant in PERS' defined contribution plan. From 2004 until July 2020, 6% of his salary was contributed to PERS' Individual Account Program (IAP), toward his defined contribution plan.

51. Starting in July, 2020, PERS no longer placed the full 6% of Mr. Adams' salary into his IAP. Because he is a Tier Two member, only 3.5% of his salary continued to be placed into his IAP, while PERS "redirected" 2.5% of his salary into his new individual "Employee Pension Stability Account" (EPSA).

52. Starting in July 2020, this "redirection" of the 2.5% of Mr. Adams' salary contributions reduced the amount invested in his IAP (defined contribution plan). Those redirected funds were invested only to eventually help ***pay*** for the defined benefit retirement benefits that Mr. Adams will eventually receive. Importantly, however, from the time Mr. Adams began membership in PERS in 1999, he had been promised a defined benefit at his retirement as part of his compensation package, for which he was not required to pay extra.

53. Mr. Adams has thereby lost the value of the 2.5% of his salary contributions to his defined contribution plan, from and after the date on which OPERF should have attained a 90% funded level.

54. Upon information and belief, if Meketa had competently performed its obligations, the PERS system would have become funded at the 90% level at a rate-setting actuarial review occurring at some point after July 2020, and the 2.5% of Mr. Adams' salary contributions would no longer be redirected away from his defined contribution plan to pay for a defined benefit to which he was already entitled.

/ / /

/ / /

55. And, if Meketa had competently performed its fiduciary obligations to Mr. Adams and the rest of the Class, OPERF's investment returns would have been substantially higher, and Mr. Adams' promised retirement benefits would be much more secure.

56. Plaintiff **Gregory J. Leijon** is a resident of Beaverton, Oregon, located in Washington County.

57. Mr. Leijon is currently employed within the State of Oregon as an Elementary School Teacher by Beaverton School District, and he has been so employed since 2017.

58. As a public employee, Mr. Leijon is a contributing member in Oregon's Public Employees Retirement System (PERS), and his membership date is July 1, 2017.

59. Mr. Leijon participates in the PERS defined benefit plan as an OPSRP (Oregon Public Service Retirement Plan) member. Mr. Leijon's 2025 Member Annual Statement shows 7 years, 7 months of total service credit.

60. Mr. Leijon is also a mandatory participant in PERS' defined contribution plan. Until July 2020, 6% of his salary was contributed to PERS' Individual Account Program (IAP).

61. Starting in July, 2020, PERS no longer placed the full 6% of Mr. Leijon's salary into his IAP. Because he is an OPSRP member, only 5.25% of his salary continued to be placed into his IAP, while PERS "redirected" 0.75% of his salary into his new individual "Employee Pension Stability Account" (EPSA).

62. Starting in July 2020, the "redirection" of the 0.75% of Mr. Leijon's salary contributions reduced the amount he invested in his IAP (defined contribution plan). Those redirected funds were invested only to eventually help ***pay*** for the defined benefit retirement benefits that Mr. Leijon will eventually receive. Importantly, however, from the time Mr. Leijon

/ / /

began membership in PERS in 2017, he had been promised a defined benefit at his retirement as part of his compensation package.

63. Mr. Leijon has thereby lost the value of the 0.75% of his salary contributions to his defined contribution plan, from and after the date on which OPERF should have attained a 90% funded level.

64. Upon information and belief, if Meketa had competently performed its obligations, the PERS system would have become funded at the 90% level at a rate-setting actuarial review at some point after July 2020, and the 0.75% of Mr. Leijon's salary contributions would no longer be redirected away from his defined contribution plan to pay for a defined benefit to which he was already entitled.

65. And, if Meketa had competently performed its fiduciary obligations to Mr. Leijon and the rest of the Class, OPERF's investment returns would have been substantially higher, and Mr. Leijon's promised retirement benefits would be much more secure.

66. Plaintiffs seek to represent themselves and a proposed class of Oregon public employees who are members of PERS retirement system and who have been injured by Meketa's actions and inactions, including but not limited to: (a) each Plaintiff having had a portion of their salary contributions redirected from their IAP accounts to their "Employee Pension Stability Accounts" (ESPAs) and having thereby lost the value from their IAP defined contribution accounts from the date on which the OPERF should have attained a 90% funded level, and (b) an increased actual threat that the full retirement benefits currently promised will not actually be available when the Plaintiffs eventually retire.

/ / /

/ / /

## VIII.
## MEKETA INVESTMENT GROUP, INC.

67. Defendant **Meketa Investment Group, Inc.,** is a registered investment advisor and provides investment advisory and consulting services to pension funds and those overseeing investments for such funds, including Oregon's Investment Council.

68. Defendant Meketa Investment Group, Inc., is a Massachusetts corporation.

69. Upon information and belief, Meketa's principal place of business is located at 100 Lowder Brook Drive, Westwood, MA 02090.

70. Meketa is listed as an active foreign business corporation under Oregon Registry No. 1019314-91.

71. Meketa's registered agent for service of process is C T Corporation System, located at 780 Commercial Street SE, Suite 100, Salem, Oregon, 97301.

72. From and after January 1, 2021, Meketa has served as the Oregon Investment Council's primary General Investment Consultant and was thereby had fiduciary and other obligations to the putative class and was obligated to assist the OIC and Treasury investment staff by, among other things, recommending investment allocations, recommending investment opportunities for Core Asset Classes (including public and private equity investments), analyzing performance of the portfolio, and reporting investment performance to Treasury Staff and the OIC.

## IX.
## JURISDICTION AND VENUE

73. Each of the Plaintiffs is a citizen and resident of the State of Oregon.

74. All members of the Proposed Class are current members of Oregon's PERS retirement system, and work as public employment employees.

/ / /

75. The vast majority of the members of the Proposed Class are citizens and residents of the State of Oregon.

76. Non-party Oregon Public Employees Retirement System (PERS) maintains offices at 11410 SW 68th Parkway, in Tigard, which is in Washington County, Oregon.

77. Non-party the Oregon Investment Council (OIC) is staffed through the Oregon State Treasury. Upon information and belief, the OIC holds meetings and conducts operations in two separate offices: one at 16290 SW Upper Boones Ferry Road, Tigard, which is in Washington County, Oregon and one at 867 Hawthorne Ave. SE, in Salem, which is in Marion County, Oregon.

78. Defendant Meketa regularly conducts and transacts business within the State of Oregon. *See, e.g.*, the online minutes of the Oregon Investment Council, referencing presentations made by the following Meketa personnel in Tigard, located in Washington County:

| | | |
|---|---|---|
| Allan Emkin | Meketa Managing Principal | 01-28-2021 |
| Mika Malone | Meketa Managing Principal | 01-28-2021 |
| Colin Bebee | Meketa Managing Principal | 03-06-2024 |
| Peola Nealon | Meketa Managing Principal | 03-05-2025 |
| Sarah Bernstein | Meketa Managing Principal | 03-05-2025 |
| Frank Benham | Meketa Mng Principal, Dir. of Research | 04-16-2025 |
| Eric Larsen | Meketa Vice President | 12-03-2025 |
| Ashley Woeste | Meketa Sr. Vice President | 05-27-2026 |
| Christy Fields | Meketa Managing Principal | 05-27-2026 |

79. The principal damages resulting from the wrongful conduct of Meketa were sustained by the Plaintiffs and the Class they represent, within the State of Oregon.

/ / /

80. The amount in controversy exceeds $5,000,000.00 exclusive of interest, costs, and attorneys' fees, and Plaintiffs also seek equitable relief.

81. Plaintiffs are unaware of any other class action having been filed within the three years preceding this filing, which asserts the same or similar factual allegations against Meketa.

## X. GENERAL ALLEGATIONS

### *i. Overview of Oregon's Public Employees Retirement System*

82. Within the public sector, part of an employee's compensation has traditionally been provided in the form of a retirement pension—a form of deferred compensation.[16]

83. PERS administers a cost-sharing, multiple-employer defined benefit pension plan for units of Oregon state government, political subdivisions (including community colleges and school districts), and public universities.

84. Participation in PERS by state governmental units, school districts, and community colleges is mandatory.

85. Participation in PERS by all Oregon public schools, charter schools, state universities, and state agencies is optional, but irrevocable if elected.

/ / /

/ / /

/ / /

---

[16] Government employees have typically been provided either a defined benefit pension or a defined contribution retirement plan. In a defined-benefit plan, the employer guarantees that the employee will receive a specific benefit amount upon retirement, regardless of the performance of the underlying investments. In a defined-contribution plan, the employer makes retirement contributions for the employee, but the amount ultimately paid to the employee at retirement depends on the plan's investment performance.

86. As of June 30, 2025, PERS had 198,258 active members, and 223,676 inactive members, for a total of 421,934 members. Of these, 198,258 were actively employed; 168,652 were receiving benefits, and 55,024 are currently not receiving benefits.[17]

87. Every PERS member is a mandatory member of one of the three tiers of the defined ***benefit*** portion of the PERS' Plan: Tier One, Tier Two, or Oregon Public Service Retirement Plan ("OPSRP" sometimes informally referred to as "Tier Three").

88. Tier One members were hired prior to January 1, 1996, Tier Two members were hired between January 1, 1996 and August 28, 2003, and OPSRP members were hired on or after August 29, 2003.

89. The PERS defined benefit plan is currently underfunded, and it has been underfunded for several years. This means that PERS currently lacks sufficient assets to pay all the defined benefit obligations that it will be required to pay in the future.

90. The most recent data located states that, "[a]s of the December 31, 2024, actuarial valuation, the System has a funded ratio of 77% for the defined benefit pension plan it administers, including employer-side accounts."[18]

***ii. Changes to Traditional Investments for Public Pension Plans***

91. Historically, public pensions invested heavily in conservative, publicly-traded, stable investments (primarily stocks and bonds, or mutual funds comprised of either or both), so the investment downside risk was limited. Investing in index-type funds (with limited fees for active management of assets) was (and is) considered a particularly solid investment choice.

---

[17] See *Oregon PERS Annual Comprehensive Financial Report,* p. 39.

[18] *Oregon PERS Annual Comprehensive Financial Report for the Fiscal Year Ended June 30, 2025*, p. 12.

92. Investing in publicly-traded investments permits transparent examination of the costs associated with these investments: the costs and fees are easily discernable. It is therefore possible to retrospectively compare the cost of each such publicly-traded investment with the return achieved, and also to compare the return on investment among differing investments.

93. In recent years, however, as performance pressures have mounted on public pension funds, many public pensions have moved a small portion of their assets out of traditional, stable investments into so-called “alternative” or nontraditional investments, most of which are in the nature of private investments.

94. Alternative investments broadly refer to investments and investment vehicles other than traditional stocks, bonds, and other publicly-traded investments. Non-traditional, alternative investments include private equity investments, hedge funds, private credit and venture capital opportunities, as well as private real estate investments, and other nonpublic opportunities. They are widely considered to be moderate to very high-risk investments.

***iii. Structure of Private Equity (and Other Alternative) Investments***

95. Unlike public investment options (such as stocks and bonds traded in public markets), when a pension plan investor (such as PERS) agrees to invest in a non-public investment (including specifically a “private equity” investment), the investment is typically structured as a Limited Partnership. Each of the investors (PERS and other pension funds or investors) acts as a Limited Partner and the investment manager acts as the General Partner. Each Limited Partner (investor) and the General Partner (advisor/manager) enter into a separate Limited Partnership Agreement. Thus, only the parties to each agreement know its terms: even the other investors may not know the terms between the General Partner and the other investors.

/ / /

96. When an investor agrees to invest in a Limited Partnership investment, the investor typically commits to pay the General Partner a certain dollar amount in the future, to be paid when the General Partner needs funds—typically over a period of years. (Thus, the payment is not made in a lump sum, but in response to “draws” requested by the General Partner.)

97. Once the General Partner has secured the promises for available funds from its investors, the General Partner begins to execute its “strategy” to acquire underlying investment opportunities

98. Private equity and similar alternative investments are typically not liquid—they often last ten years or more.

99. And, once OPERF commits to an alternative investment, there is no ready market for the Plan to divest from the investment. Although there is a limited secondary market for these investments (essentially selling to other investors), such sales are conducted at hugely discounted prices.

100. A private investment’s Partnership Agreements dictate how the investment’s expenses and those of the General Partner advisor are to be paid, how the General Partner’s fees are to be paid, and dictate the specific formula for distributions to be made from the investment to both the Limited Partner and the General Partner. There are several different kinds of fees, costs, and expenses typically associated with non-public investments structured as a Limited Partnership. Typically, the Partnership Agreement for such an investment includes all of the following:

> [A] **management fees**: The General Partner (investment manager) charges each investor annual “management fees”: these fees are usually a percentage of the total amount that the investor has agreed to contribute to the investment in the future (whether the agreed amount has yet been invested or not).

/ / /

> [B] **expenses of the limited partnership:** The General Partner typically has wide discretion to pay the expenses and costs of operating the limited partnership, out of the partnership funds. This category of expense can vary widely from investment to investment, depending on, among other things, the capabilities and integrity of the General Partner.
>
> [C] **carried interest:** After the annual management fees are collected and the expenses paid, each Limited Partnership Agreement explains how its net profits are to be distributed. An agreed percentage of the profits is typically distributed to the investors first (often 8%), then often the General Partner and the investors split the remaining profits in agreed-upon percentages. Historically, many limited partnerships provided that the General Partner would receive 20% of any profits while the limited partners split the remaining 80% of any profits. The portion of this distribution which goes to the General Partner is called the General Partner's "carried interest."

101. Because alternative investments are not publicly traded and are governed by private Limited Partnership Agreements, it is extraordinarily difficult to accurately ascertain the complete cost of the investment's fees, costs, and expenses. It is therefore often impossible for anyone other than the investment manager to ascertain the total amount of the investment's fees, costs, and expenses. This also means that it may be difficult or impossible to compare the overall costs of an alternative investment with the return achieved, and difficult or impossible to compare the fees, costs, and expenses of one alternative investment with another.

102. A further difficulty in evaluating alternative investments arises in the context of establishing benchmarks to examine and evaluate performance of an individual fund and of different sectors within an alternative space. Unlike well-established and recognized benchmarks in the public investment realm, it is common in the alternative space for financial advisors to create their own performance benchmarks. Benchmarks in this space are often seen as malleable and constructed in a manner that increases the likelihood that the fund advisor who recommended them will appear to meet its investments goals.

103. Perhaps the most disturbing fact about private equity investments (and most other alternative investments) is the "blind risk" aspect. This means that the investors do not (and cannot) know what specific underlying investments (i.e. companies) the General Partner will invest in when the investors approve a recommendation made by an investment consultant to commit money to a specific investment. In other words, **investment consultants' recommendations were and are typically that the OIC invest retirees' money into a specific limited partnership without knowing what underlying companies the limited partnership plans to invest in.**

104. A consultant's recommendation that OPERF invest in a particular private equity investment or other alternative investment is thus premised on the consultant's evaluation of the General Partner's background and track record in other investment contexts. As the *Investment Policy Statement for Oregon Public Employees Retirement Fund,* adopted – April 17, 2024, p. 8 states: "Private market investment success is predicated on identifying skilled managers."

### *iv. Why Private Investments Are Problematic for OPERF*

105. Blind risk investing is particularly problematic for the Oregon pension fund. A significant number of Oregonians hold strong ethical views about the investments held by OPERF. Recent public comments directed to the Oregon Investment Council call for OPERF to avoid (and/or divest) investments in companies that:

a. promote use of fossil fuels,

b. adversely impact climate change,

c. engage in human rights violations (both in the United States and abroad),

d. engage in unlawful or unethical workforce management practices,

e. engage in union-busting activities,

f. engage in gender-based violence and harassment,

g. promote or service ICE detention facilities, or

h. otherwise violate the Sanctuary Promise Act of 2021.

106. In fact, Oregon's Legislature passed the ***Thermal Coal Act*** (the COAL Act), effective January 1, 2025, at ORS 293.798-803 (requiring the OIC and Treasurer to act consistently with their fiduciary duties to try to ensure that OPERF money is not invested in "any fund containing a thermal-coal company") as well as the ***Climate Resilience Investment Act***, effective September 26, 2025 at ORS 293.809 (requiring the OIC and Treasurer to analyze and manage climate-change risks to OPERF, and reduce carbon intensity through preference for investments that reduce net greenhouse-gas emissions); and the ***Oregon Human Rights and Anti-Genocide Act of 2005***, ORS 293.811-832 and ORS 293.837-847 (together requiring the OIC and the Treasurer to "try to ensure" that publicly traded equities are not invested in Sudan and Iran).

107. Yet, with blind risk investing, when the OIC commits OPERF to an alternative investment, there simply is no way to know whether the General Partner (investment manager) will invest in a company that engages in these practices.

108. And, because there is no way to exit these private equity commitments without a drastic discount, the option to divest from unethical investments after the fact is not an economically realistic option.

109. The blind risk approach (precluding screening for Environmental Social & Governance concerns), the illiquid nature of most of these investments, the risky debt structuring, the high fees, the lack of transparency about fee and expense structure, and the potential for significant Plan losses made large amounts of these and similar private market investments unsuitable for Oregon's public employees' retirement plan.

/ / /

110. At all times relevant to this lawsuit, PERS' portfolio has included an extremely high percentage of alternative and non-traditional investments (including specifically private equity investments), compared to other public pension portfolios of comparable size.

111. As a third-party firm, CEM Benchmarking concluded in its October 22, 2025 evaluation of PERS' Defined Benefit Plan, 60% of PERS' assets at the end of 2024 were "high-cost" assets (such as hedge funds and private equity), as opposed to a peer average (i.e. other pension funds) of only 38% "high-cost" assets.[19] Conversely, that same study concluded that PERS' Defined Benefit Plan had a public market allocation (including cash and derivatives) of only 40% at the end of 2024, while peers had an average of 62%.

112. OPERF's grossly overweight percentage allocation to alternative assets negatively impacts OPERF in ways which are not immediately obvious. First, because private investments are largely (or entirely) illiquid, OPERF's need for cash (i.e. liquidity) to satisfy current benefits obligations must often be satisfied by liquidating public investments, regardless of whether it is an opportune time for OPERF to sell those investments. This repeatedly reduces the volume of public investments and contributes repeatedly to underweight holdings in public investments.

113. Second, the fact that OPERF maintains such a high percentage of private investments has actually caused OPERF to alter the way it allocates its *public* market portfolio. As reported on May 8, 2024, in the online article Top1000 funds.com, *Looking for the exit: Oregon battles overweight allocations to illiquids*:

> One way the Oregon team are approaching the problem is by reducing risk in the liquid portfolio. Comprising fixed income, public equity, and hedge funds, it is **supposed to be split 55:45**

[19] *October 22, 2025 CEM Benchmarking Report of Defined Benefit Results 2024*, p. 14.

> **between stocks and bonds respectively**. **Today it is tilted 40:60 in favour of bonds.**
>
> "We have decided that the mix of this piece of the portfolio needs to be less risky. We look at the risk level of the liquid portion of the portfolio relative to how much weight to illiquids we have, and we want this part of the portfolio to be less risky so it has lower drawdown potential and enables us to pull funding from it overtime." [20] (Emphasis added, and quoting Rex Kim).

114. This *ad hoc* reduction within OPERF's public equity allocation (from 55% in stock to only 40% in stock) necessitated by the portfolio's overweight allocation to private investments may indeed serve to reduce risk, but it also drastically reduced OPERF's investment ***performance*** over the last few years.

115. Third, the high allocation to illiquid investment funds over the last number of years has limited OPERF's current ability to correct the resulting over-allocation to private equity investments. Meketa acknowledged this in its September 2, 2026 OIC Asset-Liability Study: Final Model Output, at p. 51 (part of the Appendix): "**OPERF's existing allocations to illiquid asset classes are a significant constraint for materially modifying the policy portfolio allocation targets. This challenge is magnified by the actual portfolio's relative overweight (~49.5%) to illiquid classes compared to the current policy portfolio targets (40.0%)**." (Emphasis added).

### *v. OPERS' Defined Contribution Component*

116. As addressed above, all eligible current employees of participating employers participate in PERS' defined *benefit* plan. This aspect of the Plan is funded by members' employers and by the OPERF investment returns.

/ / /

---

[20] https://www.top1000funds.com/investor-profile/looking-for-the-exit-oregon-battles-overweight-allocations-to-illiquids/

117. In addition to the defined benefit plan, however, for all PERS members who were employed at any time after January 1, 2004, the system also has a mandatory defined *contribution* component. This defined contribution component is funded by mandatory contributions from the member's own salary.

118. As originally enacted in 2004, for most members, 6% of their salary was placed into the Individual Account Program (IAP), where it was invested, so that all resulting proceeds would be available to the member to withdraw at retirement as the defined contribution portion of their retirement plan.

119. The funds in PERS members' IAPs are invested by the Oregon Investment Council. Unlike the OPERF funds, PERS Members may generally choose how their IAP funds are invested. Members are offered a limited selection of OIC-approved target-date funds (or their funds are invested based on an age-based default fund).

### ***vi. Responsibility for Investing Oregon's Public Employees' Retirement Funds (OPERF)***

120. The funds in PERS' defined benefit plan are housed in the Oregon Public Employees Retirement Fund (OPERF).

121. The Oregon Investment Council (OIC) is responsible for overseeing the investment and management of the investment funds entrusted to it, including assets of OPERF.[21]

122. The *Investment Policy Statement for Oregon Public Employees Retirement Fund,* adopted – April 17, 2024, p. 7, addresses the role that Meketa occupies here, as an Investment Consultant:

---

[21] *Investment Policy Statement for Oregon Public Employees Retirement Fund,* adopted – April 17, 2024, p. 5.

> The Investment Consultants report to the OIC, while supporting the responsibilities of Treasury staff, as needed and pursuant to the contractual obligations agreed to by the parties. These responsibilities include, but may not be limited to:
>
> • Review and develop investment policies and asset class guidelines
>
> • **Recommend asset allocation strategy** by conducting Asset Liability and Asset Allocation Studies
>
> • Establish long-term capital market assumptions
>
> • Review asset class benchmarks as well as performance and risk objectives
>
> • Quarterly performance reporting
>
> • **Assistance with manager searches, manager due diligence, and manager monitoring**
>
> • Market Research, Economic Outlook, and Investment and Trustee Education (Emphasis added.)

123. ORS § 293.721 provides:

> Moneys in the investment funds shall be invested and reinvested to achieve **the investment objective of the investment funds, which is to make the moneys as productive as possible**, subject to the standard set forth in ORS 293.726. (Emphasis added.)

124. ORS § 293.736(1) addresses the obligations of the "investment officer" (defined by ORS § 293.701(3) as the State Treasurer of Oregon, in the capacity as investment officer for the Oregon Investment Council) thusly:

> (1) Except as provided in ORS 293.741, in amounts available for investment purposes and subject to the policies formulated by the Oregon Investment Council, **the investment officer shall invest and reinvest moneys in the investment funds and acquire, retain, manage**, including exercise of any voting rights, **and dispose of investments of the investment funds**. (Emphasis added).

125. The Oregon Investment Council (OIC), in turn, is granted discretion by statute, to contract with expert investment consultants to perform various "investment officer" functions (i.e., investing):

> The **Oregon Investment Council may enter into contracts with** one or more persons whom the council determines to be qualified, whereby the persons undertake, in lieu or in addition to the investment officer [i.e. the State Treasurer], **to perform the functions specified in ORS 293.736** to the extent provided in the contract. Performance of functions under a contract shall be paid for out of the gross interest or other income of the investments with respect to which the functions are performed, and the net interest or other income of the investments after that payment shall be considered income of the investment funds. … (Emphasis added). [ORS 293.741].

126. Meketa entered into a contract with the Oregon Investment Council, under which Meketa agreed to perform enumerated services for the benefit of every member of the Public Employees Retirement Fund (OPERF), including but not limited to, the Plaintiffs and the Class of PERS members they seek to represent.

### ***vii. The Importance of OPERF's Asset Allocation***

127. The *Investment Policy Statement for Oregon Public Employees Retirement Fund,* adopted – April 17, 2024, p. 8 acknowledges the importance to PERS of determining how much of any specific type of investment the OPERF invests in. That page contains a large bold heading: "**ASSET ALLOCATION DRIVES RISK AND RETURN**" for the OPERF.

128. Below this heading, the Policy Statement states:

> **A. Asset allocation is the OIC's primary policy tool for managing the investment program's long-term risk/return profile.**
>
> • Decisions regarding strategic asset allocation will have the largest impact on the investment program's realized return and risk.
>
> • The timing and magnitude of projected employer contributions and future benefit payments have significant cash flow implications and thus will receive explicit consideration during the OIC's asset allocation decision-making process.
>
> **B. Portfolio construction, including diversification and correlation considerations, is essential to maximizing risk-adjusted returns.** (Emphasis in original).

### *viii. The 2020 "Redirection" Plan*

129. As previously alleged, beginning in 2004, for most non-judicial PERS members, 6% of their salary was placed into the Individual Account Program (IAP), where it was invested as part of a defined contribution plan.

130. But effective July 1, 2020 by statute, PERS no longer placed the full 6% of each contributing member's salary contribution into their IAP account. Rather, as of that date, PERS "redirected" part of this 6% amount into a new individual "Employee Pension Stability Account" (EPSA).

131. For Tier One and Tier Two members, PERS "redirected" 2.5% of each member's salary into an EPSA, and for members of OPSRP, PERS "redirected" 0.75% of each member's salary into an EPSA.

132. As a result of this "redirection," the full 6% of each contributing member's salary was no longer placed into the member's IAP to be invested as part of the member's defined *contribution* plan. Instead, the redirected funds (those in the EPSA) were invested to be used to fund the cost of the member's eventual defined *benefit* retirement benefits.

133. For each additional dollar redirected from a member's IAP, the member's retirement savings in their defined contribution plan is directly reduced by the same amount, and members lose the potential for those dollars to grow over the remainder of their careers.

134. The redirect statute contains a temporal limitation. PERS' obligation to redirect part of member's salaries is to be suspended for a two-year period, when "the funded status of the system" is 90 percent or greater. ORS § 238A.330(2)(c).

135. The "funded status of the system" has not been "90 percent or greater" at any time since July 1, 2020.

136. As of June 30, 2025, the Total Fiduciary Net Position of PERS' Defined Benefit Pension Plan was $88,622,015,000; the Total Fiduciary Net Position of PERS' Individual Account Program (i.e. the defined compensation component) was $15,253,843,000; and the Total Fiduciary Net Position of PERS' Deferred Compensation Plan (not at issue in this case) was $3,609,659,000.[22]

137. This suit centers on the investments, administration, and management of the Defined Benefit Plan and the Individual Account Program in the Oregon's Public Employees Retirement System. Defendant Meketa's wrongdoing has injured Plaintiffs and the Class Members by, among other things, recommending increases to, and failing to recommend reductions in, OPERF's outsized allocation to alternative investments (and private equity investments in particular) that were objectively unsuitable for a pension fund, and which in fact performed poorly. Meketa also failed to recommend increases to OPERF's allocation to public equity investments. Among other things, the resulting low investment performance has impaired and diminished the PERS Plan's opportunity to achieve a 90% funded level threshold sooner.

***ix. Camouflaged and Confusing Information to Plan Members About Returns***

138. In PERS' ***Perspectives* newsletters** for its members, there was no mention of how the burgeoning volume of alternative investments performed between 2020 and 2025. The focus in the newsletters was on returns for the portfolio as a whole:

2020

a. "The Oregon PERS Fund (OPERF) earned 7.7% in investment returns for 2020."[23]

---

[22] See *Oregon PERS Annual Comprehensive Financial Report*, p. 33.

[23] OPSRP (Tier III) newsletter, April 2021. *See also* Tier I/II Newsletter for April 2021: "The Oregon Public Employees Retirement Fund ended 2020 up 7.7% for the year."

2021

b. "The Oregon Public Employees Retirement Fund (OPERF) earned 20.05% in investment returns for 2021. However, annual earnings credited to member accounts will be different than this rate. They differ because of administrative expenses and various requirements set by state law, administrative rules, and PERS Board actions."[24]

c. "In 2021, for example, OIC set an expected rate of return of 6.8%, while the PERS Board set an assumed rate of 6.9%. While both entities agreed that the real rate of return should be 4.5%, OIC adopted an inflation rate of 2.4%, whereas the board adopted an inflation rate of 2.5%. These differing inflation rates resulted in the rates OIC and the board set: 6.8% and 6.9%, respectively."[25]

2022

d. "OPERF's performance garnered recognition as the best-performing fund among pension peers in fiscal year 2022 and over the past 20 years, according to the Wilshire Trust Universe Comparison Service."[26]

e. "The Oregon Public Employees Retirement Fund (OPERF) earned -1.55% in investment returns for 2022."[27]

2023

f. "The Oregon Public Employees Retirement Fund (OPERF) earned 5.98% in investment returns for 2023."[28]

---

[24] Tier I/II Newsletter, April 2022. The OPSRP Newsletter for April 2022 was similar.

[25] This language was included in both Newsletters sent in April, 2022.

[26] This language was included in both Newsletters sent in April, 2023.

[27] OPSRP (Tier III) newsletter, April 2023. *See also* Tier I/II Newsletter for April 2023, which adds: "However, annual earnings credited to member accounts will be different than this rate. They differ because of administrative expenses and various requirements set by state law, administrative rules, and PERS Board actions."

[28] This language was included in both Newsletters sent in April, 2024.

2024

g. "The Oregon Public Employees Retirement Fund (OPERF) earned 5.71% in investment returns for 2024."[29]

h. "Yes, we have an unfunded actuarial liability just like nearly every pension system, but we are actively addressing it. Our funded status as of December 31, 2023, was 72%. Projections show that under a steady 6.9% return scenario, we could reach 100% funding by 2037."[30]

2025

i. "The Oregon Public Employees Retirement Fund (OPERF) earned 9.68% in investment returns for 2025."[31]

j. "**Private equity reductions**: The share of OPERF investments allocated to private equity has been on the decline since it reached 29% in May 2024. As of December 31, 2025, the end of my first year in office, it was down to 24.7%."[32] (April 2026, article by State Treasurer Steiner).

139. In 2025, news reports began to surface revealing OPERF's large allocation to private equity and other alternative investments, and the devastating impact that these investments were having on returns:

> Oregon could be particularly vulnerable to [a cyclical] downturn because its Public Employees Retirement Fund is something of an outlier among U.S. public pension systems, a review by The Oregonian/OregonLive has found. **More than 27% of Oregon's portfolio is invested in private equity funds, above its own**

---

[29] This language was included in both Newsletters sent in April, 2025.

[30] This language was included in both Newsletters sent in August, 2025. (footnote omitted).

[31] This language was included in both Newsletters sent in April, 2026. *See also* Tier I/II Newsletter for April 2026, which adds: "However, annual earnings credited to member accounts will be different than this rate. They differ because of administrative expenses and various requirements set by state law, administrative rules, and PERS Board actions."

[32] This language was included in both Newsletters sent in April, 2026.

> **internal target and almost triple the 10.4% average allocation** of 201 public pension funds surveyed by the National Conference on Public Employee Retirement Systems.
>
> **Add in the fund's investments in other so-called alternative assets** that aren't publicly traded and are difficult to readily sell – real estate, hedge funds, natural resources, etc. – **and they account for 60% of Oregon's investments**, also notably above Oregon's internal target and double that of other public pension systems in the 2025 study.
>
> A separate 2025 study of 253 state and local pension plans by the Equable Institute, a non-profit that provides pension education, found that **Oregon PERS had the second highest allocation to alternatives**, 2 percentage points higher than Washington's retirement system.
>
> Financial managers of most pensions aren't comfortable with an investment mix like that.
>
> According to a survey of U.S. pension fund managers from Ortec Financial B.V. earlier this year, half believed the reasonable maximum allocation to private assets was between 20% to 30% of their investment portfolios. About a third of managers were comfortable with 30% to 40%. Only a fraction said they'd be comfortable going up to 50%.[33]

## XI.
## MEKETA INVESTMENT GROUP, INC.
***General Consultant Services (01-01-2021 to present)***

140. On or about January 1, 2021, the Oregon Investment Council entered into a three-year contract with Meketa by which Meketa agreed to provide primary General Investment consulting services. [**EXHIBIT 1,** *Meketa 2021 Contract*].

141. In addition to the initial three-year contract term, two pre-negotiated two-year extensions were available at the OIC's discretion. Both of those extensions have been

---

[33] *Oregon's pension fund bet big on private equity. That could be a problem*, July 21, 2025, Oregonlive. https://www.oregonlive.com/business/2025/07/oregon-pension-systems-risky-investment-strategy-under-scrutiny.html

implemented. Upon information and belief, unless terminated, this contract extends through December 31, 2027.

142. The Contract provides that the OIC would pay Meketa the following annual fees:

| | | |
|---|---|---|
| Year One: | $450,000.00 | [01/01-21 – 12-31-21] |
| Year Two: | $450,000.00 | [01/01/22 – 12-31-22] |
| Year Three: | $450,000.00 | [01/01/23 – 12-31-23] |
| Optional | | |
| Year Four: | $475,000.00 | [01/01/24 – 12-31-24] |
| Year Five: | $490,000.00 | [01/01/25 – 12/31/25] |
| Optional | | |
| Year Six: | $505,000.00 | [01/01/26 – 12/31/26] |
| Year Seven: | $520,000.00 | [01/01/27 – 12/31/27] |

[**EXHIBIT 1**, *Article 4.]*

143. As set forth in Exhibit A (Statement of Work) to the contract **EXHIBIT 1**, among other things, that contract obligated Meketa to perform the following services:

> **A. Consultant's Services.** The Consultant will provide expert guidance to Treasury and the OIC, as further described below. The following services (the "Services") will be requested primarily for OPERF, but also for other Investment Funds, including but not limited to the CSF, SAIF, the OSTF, and other accounts designated by Client. The Services will include, but are not limited to:
>
> 1) **Recommending** investment policy & **asset allocation strategy** (may include governance and policy reviews upon request);
>
> 2) **Furnishing**, as requested, quantitative and **qualitative evaluations** and comparisons of (i) **investment managers for the Core Asset Classes** (**equity**, fixed income and risk parity), including, without limitation, **recommendations with respect to the retention, replacement and engagement of additional investment managers** based on Consultant's evaluations and independent research, and (ii) the allocation of Client assets among the evaluated managers ("Core Managers"). Consultant's review of Client's investment managers shall include:
>
>> (a) a description of each manager's investment method, role in the Core Asset Class and responsibilities;
>>
>> (b) long and short term objectives for performance;
>>
>> (c) a statement of an appropriate risk adjusted nominal and real performance benchmark and index for each Core Asset Class and for the aggregate Core Asset Classes;

(e) reporting requirements regarding portfolio composition, turnover, yield on investment and any significant changes in personnel, ownership or control of any investment manager;

(f) criteria for compliance of the assets with the investment objectives, criteria and guidelines of the Client; and

(g) a comparison of performance of each investment manager's portfolio against the broad market or appropriate indices using performance data furnished by State Street Bank and Trust, Client's master custodian (or such other custodian as Client may from time to time designate);

3) **<u>Recommending guidelines and policy for the allocation and diversification of Client's assets among various asset classes as deemed appropriate</u>**. Formally, on a three to five-year cycle, Consultant shall perform an asset-liability study of the Oregon Public Employees Retirement Fund.

4) Furnishing Client with reports generated by Consultant's Research and Development Department which are published from time to time with respect to new developments in United States and foreign capital markets and to investment techniques which may affect Client's investments in the Core Asset Classes. Consultant further agrees to report to the Client as necessary on all matters which represent significant changes in economic forecasts, investment outlook, industry emphasis and any other matters which may constitute or pose the possibility of significant deviations from Client's investment strategy or objectives;

5) As further specified by Client, providing quarterly reporting to Client that includes monitoring and reporting of public markets managers, portfolio and manager level analytics, performance and attribution analyses, fee analyses, and risk analyses at the asset class and portfolio level.

6) Conducting periodic consulting client conferences and client education seminars to which Client or its representatives shall be invited without additional fees.

7) As further specified by Client, **<u>conducting</u>** portfolio analytics and **<u>attribution analyses</u>**;

8) Operational support, such as performance and market value reconciliation, custody and operational review, and a custody Request for Proposals (RFP);

9) General research; and

10) Other projects as specified by Treasury staff and the Council.

**B. Attendance at Meetings.** Consultant shall:

1) Attend regular and special meetings of the Council, as requested;

2) Be available for additional meetings with Treasury staff in Treasury's offices on a reasonable as needed basis;

[**<u>EXHIBIT 1</u>,** *Meketa 2021 Contract*]. (Emphasis by bold and underline added).

144. The contract also addressed Meketa's standard of care in performance of its obligations:

> **8.3. Fiduciary Responsibility**. Consultant represents and warrants to Client that:
>
> **8.3.1. Prudent Expert Standard.** Consultant has the requisite experience, expertise and resources to fully and properly perform all of its duties and obligations set forth herein. Consultant represents itself as being possessed of greater knowledge and skill than the average person and is under a duty to exercise a skill greater than that of an ordinary person and the manner in which its performance hereunder is handled will be evaluated in light of Consultant's superior skill. **<u>Consultant acknowledges it is a fiduciary under this Contract</u>** and as a fiduciary it shall discharge each of its duties and exercise each of its powers, with the care, skill, prudence and diligence under the circumstances that a prudent expert acting in a like capacity and familiar with such matters would use in the conduct of any enterprise of like character with like aims.
>
> **8.3.2. Duty to the Fund.** Consultant shall discharge its duties hereunder with respect to the Fund **<u>solely in the interest of the members, retirees and beneficiaries of the Fund</u>**. Consultant shall not in any capacity: (a) act in any transaction involving the Fund on behalf of a party or represent a party whose interests are adverse to the interests of the Fund or its members and beneficiaries; or (b) receive any consideration for its personal account from any party dealing with the Fund in connection with a transaction involving the assets of the Fund.

[**<u>EXHIBIT 1,</u>** *Meketa 2021 Contract*]. (Emphasis by bold underline added).

145. Meketa breached its fiduciary obligations to the Plaintiffs in numerous ways, as set forth herein.

146. Meketa should have repeatedly recommended to the OIC and Treasury Staff that OPERF's outlier allocation structure be substantially modified to reduce its very large allocation to private equity and to increase its small allocation to public equity investments.

147. However, as shown in *Figure E*, between January 1, 2021 (when Meketa became the OIC's primary general consultant) and June 2026, the oregon.gov/treasury/invested-for-oregon/pages/performance-holdings.aspx reveals that the actual percentages of OPERF's investment portfolio that were invested in private equity and public equity investments were as follows:

/ / /

*Figure E*

| Date | Private Equity | Public Equity |
|---|---|---|
| June 2021 | 25.1% | 29.4% |
| December 2021 | 25.7% | 26.7% |
| June 2022 | 28.0% | 21.1% |
| December 2022 | 26.6% | 21.3% |
| June 2023 | 27.8% | 17.1% |
| December 2023 | 28.1% | 16.5% |
| June 2024 | 28.4% | 16.0% |
| December 2024 | 26.5% | 17.3% |
| June 2025 | 26.5% | 18.0% |
| December 2025 | 24.7% | 20.1% |
| June 2026 | 23.1% | 24.0% |

148. Although the OIC is certainly entitled to set the allocation it believes to be appropriate, Meketa was and is the expert that the OIC hired to advise it, and Meketa knew that OPERF's allocation was grossly disproportionate to the allocations maintained by the vast majority of other pension funds in the nation, including other pension funds the general size of Oregon's.

149. There are additional reasons why Meketa should have promptly and repeatedly recommended that OPERF reduce its allocations to private equity and increase its allocation percentage to public equity. It was or should have been evident to Meketa as an expert at least by 2021 that private equity as an asset class was no longer performing as well as it had in the past (and that it was continuing to drain costs, fees and expenses from OPERF).

150. In addition, the blind risk aspect of private equity and other alternative investments should have caused Meketa to recommend a drastic reduction in OPERF's allocation to alternatives. Oregonians are overwhelmingly in favor of limiting the scope of investments to ethical companies and that simply cannot be accomplished in an economically reasonable way by blind investing and then divesting after-the-fact at a huge loss those investments that violate ESG standards.

151. Meketa was well aware of the problems that the large allocation to private equity caused, but astoundingly made no efforts to recommend prompt action to address the issue. Indeed, instead of recommending a *reduction* in OPERF's allocation to private equity investments, on November 2, 2022, Meketa specifically recommended that OPERF *increase* its private equity then-current *target* allocation from 20.0% to 22.5% of its overall portfolio.

152. Two and a half years later, in its May 28, 2025 Asset Allocation Review, Part II – Risk/Return Analysis, (p. 10) Meketa stated: "It is well understood that the actual portfolio is overweight private markets (largely Private Equity) and underweight public markets (largely Public Equity)." (sic) But Marketa nonetheless concluded (at page 18) that: "Both the current Policy and Actual portfolios are positioned to achieve the long-term objectives of OPERF." Indeed, Marketa noted that, "[i]n 2026, a comprehensive asset-liability study will be conducted, where the OIC may elect to modify the policy target weights as an outcome." (p. 18).

153. Separate and apart from its contractual obligations, Meketa also owed a fiduciary duty to the Plan members to recommend investments that provide the greatest return on the Plan members' funds at the least cost and expense. See ORS § 293.721 ("investment objective … is to make the monies as productive as possible.")

154. This should have required that the fee, cost, and expense structure of each proposed investment be transparent and comprehensible before the investment is made, and that each recommendation represent an actual choice among several possible investments. It further required that the investment recommendations be characterized by loyalty to the Plan members over loyalty to investment managers or general partners. Upon information and belief, Meketa failed to perform these obligations, thereby concealing the fact that OPERF paid excessive fees, costs and expenses on alternative investments under Meketa's watch.

155. As a fiduciary to the Plan members, Meketa was required to disclose the existence of excessive fees, costs, and expenses and take measures to assist the OIC to reduce them, including not limited to assisting the OIC to negotiate lower fees, costs, and expenses. Upon information and belief, it wholly failed to do so.

156. The true cost of private equity and alternative investments (including all fees, expenses, and carried interest) renders them overpriced, given their overall lackluster performance. To the extent that Meketa did not disclose the true total cost of these investments in its reports, it concealed the fact that these (and, upon information and belief other, additional) investments were costing the Plan members excessive fees and providing a diminished net return.

157. Further, to the extent that Meketa did not recommend reducing OPERF's allocation to these expensive investments or otherwise recommend investments with less expensive overall fees, costs and expenses in the first place, Meketa concealed the fact that these (and, upon information and belief other, additional) investments were costing the Plan members excessive fees, costs, and expenses.

158. As a fiduciary to the Plan members, Meketa also had a duty to familiarize itself with relevant Oregon law that affected or should affect its investment recommendations, including, but not limited to, the redirect provisions of the Oregon statutes that became effective in 2020, the Sanctuary Promise Act of 2021, and the Climate Resilience Act enacted in 2025 (directing the OIC and the State Treasurer to take specified actions to manage the risks that climate change poses to the OPERF).

159. Under the totality of the circumstances, Meketa should have determined that OPERF's portfolio was overextended in the alternative/non-traditional space, should have promptly and repeatedly told the OIC and the State Treasury that OPERF's investment allocations

were overweight with alternative/non-traditional investments, and should have recommended drastic reductions (or suspension) of new commitments to such alternatives/non-traditional investments, should have recommended secondary sale or other divestment of a portion of these investments, and/or should have otherwise renegotiated (or recommended the renegotiation) of the terms of these investment partnership agreements to reduce the fees, costs and expenses.

160. The acts and omissions of Meketa alleged were a substantial factor in causing injury to the Class.

## XII.
## THE UNREASONABLY RISKY, ILLIQUID, AND EXPENSIVE ALTERNATIVE INVESTMENT PORTFOLIO

161. Meketa, as the OIC's primary general consultant, was responsible for oversight of the entire portfolio, which included understanding the suitability and cost structure of each investment category for the OPERF. This obligation included a duty as an expert to understand the impact that increasing or decreasing the specific allocations to each category would likely have on the portfolio's net performance (after all costs, fees, and expenses), before making allocation recommendations.

162. The Restatement of Trusts makes note of the competitive and variant nature of the marketplace for investment products, emphasizing that prudent fiduciaries must be aware of the "availability and continuing emergence of modern investment products, not only with significantly varied characteristics but also with similar products being offered with significantly differing costs." Restatement (Third) of Trusts ch. 17 ("Investment of Trust Funds"), intro note (2007).

163. Despite these responsibilities, Meketa breached its fiduciary and contractual duties to Plaintiffs and the Class members to prudently manage the investments and the responsibilities assigned to it for the benefit of the Class Members.

164. Meketa, as the OIC's primary general consultant, should have anticipated OPERF's liquidity needs (both for paying the fees on OPERF's overweight alternative investment portfolio, and for paying current retirement benefits) and it should have repeatedly recommended that the allocation percentage to private equity and additional alternative investments be substantially reduced.

165. Upon information and belief, Meketa made no effort to evaluate the gross costs of OPERF's alternative investments (i.e. including all fees, costs (including carry), and expenses).

166. Given the fiduciary obligations that Meketa owes to the OIC, OPERF, and the Plan members themselves, Meketa should have affirmatively recommended to the OIC and Treasury that OPERF reduce its high percentage of private equity and other alternative, non-traditional investments, notwithstanding the OIC's Staff desire to continue pouring members' money into these investments.

167. Despite these responsibilities, Meketa continued to avoid recommending low-cost indexed-type investments, instead effectively rubber-stamping the OIC's desire that OPERF invest in costly investment vehicles in a futile attempt to beat the market.

168. When the results obtained by OPERF are compared to the results obtained by other public pension funds, it is evident that Meketa's actions and inactions (and the resulting portfolio overweight in alternative investments) caused significant Plan losses, as well as damage and injury to Plaintiffs and the Class.

169. Upon information and belief, Meketa failed to reveal/disclose the details of its work and lack of diligence and material information about the private equity portfolio, as well as the broader alternative investment portfolio, including the fees, costs, and expenses of (and thus the total performance of) the investments.

170. Meketa failed to use reasonable care, skill and caution in undertaking its obligations.

171. Despite its fiduciary duties to Plan members, Meketa violated its duties to identify and disclose excessive fees, costs, and expenses.

## XIII.
## CLASS ACTION ALLEGATIONS

172. Plaintiffs incorporate by reference all preceding and subsequent allegations as if set forth herein.

173. Plaintiffs bring this action, on behalf of themselves and all other similarly situated persons whose pension contributions or pension benefits have been affected by Defendant Meketa's actions and inactions, including its investment allocation recommendations, decisions, and other wrongful conduct (hereafter "the Class") defined as follows:

> **All current PERS active members (including those on temporary leave) who have had any portion of their mandatory defined compensation plan "redirected" from their Individual Account Program (IAP) to an Employee Pension Stability Account (EPSA).**

174. The Class complies with the Class Action requirements contained in Fed. R. Civ. P. 23.

175. The class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1).

176. There are questions of law common to the Class, Fed. R. Civ. P. 23(a)(2), including but not limited to:

a. When the claims of the Class accrued; and

/ / /

b. Whether statutory and trust law principles also apply to augment the fiduciary duty obligations imposed by contract; and

c. Are the Class Members third-party beneficiaries of the contract between the OIC and Meketa.

177. There are also questions of fact common to the Class, Fed. R. Civ. P. 23(a)(2), including but not limited to:

a. Whether Meketa breached its fiduciary duties to the Class Members;

b. Whether the actions and inactions of Meketa injured the Class Members; and

c. The amount of damages that the actions and inactions of Meketa caused to Class Members.

178. The claims of the representative parties are typical of the claims of the class. Fed. R. Civ. P. 23(a)(3).

179. The representative parties will fairly and adequately protect the interest of the class. Fed. R. Civ. P. 23(a)(4).

180. With regard to Fed. R. Civ. P. 23(b)(1):

a. Prosecution of separate actions by individual Class Members would create a substantial risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendant Meketa, Fed. R. Civ. P. 23(b)(1)(A); and

b. Prosecution of separate actions by individual Class Members could cause adjudications that could be dispositive of the interests of other Plaintiff Class Members.

/ / /

181. With regard to Fed. R. Civ. P. 23(b)(3), the common questions of fact and law predominate over any question(s) affecting only individual class members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy since it will promote the convenient administration of justice and will achieve a fair and efficient adjudication of the controversy because there are many thousands of potential Class members. Among other things:

a. In light of the complex nature of alternative investments, the expert testimony required to prove this case, and the cost of litigation generally, it is highly unlikely that individual members of the class will have significant interest in individually controlling the prosecution of separate actions. Fed. R. Civ. P. 23(b)(3)(A);

b. Plaintiffs' counsel are unaware of any litigation concerning the controversy at issue in this Complaint already commenced by any members of this Class. Fed. R. Civ. P. 23(b)(3)(B);

c. It would be highly desirable to concentrate litigation of the claims in this action in one forum. Fed. R. Civ. P. 23(b)(3)(C); and

d. There are unlikely to be an unusual difficulties in managing this case as a Class Action. Fed. R. Civ. P. 23(b)(3)(D).

182. To the extent that any allegation pleaded herein is inconsistent with any other allegations pleaded, they are pleaded in the alternative.

/ / /

/ / /

/ / /

/ / /

**-COUNT I-**
**BREACH OF FIDUCIARY DUTY**

183. Plaintiffs incorporate by reference all preceding and subsequent allegations as if set forth herein. To the extent that any allegation is inconsistent with the allegations herein, this count is pleaded in the alternative.

184. Meketa served and continues to serve as a fiduciary of the Oregon Public Employees Retirement System, the Oregon Public Employees Retirement Fund, the Oregon Investment Council, and the members and beneficiaries of PERS in a variety of respects under contract, trust law, statutory law, common law, and public policy.

185. At all relevant times, Meketa was a fiduciary and was duty-bound to discharge its fiduciary duties with respect to PERS solely in the interest of the Plan's members and beneficiaries and with utmost, undivided loyalty to their interests, in good faith, and with the care, skill, prudence, and diligence under the circumstances that a prudent expert acting in a like capacity and familiar with such matters would use in the conduct of any enterprise of like character with like aims.

186. Indeed, by trust law, statutory law, common law, public policy, as well as contractual obligation, Meketa owed and owes fiduciary duties to Plan members to exercise that degree of judgment, skill and care under the circumstances then prevailing which persons of prudence, discretion, and intelligence who are experts in such matters exercise in the management of their own affairs not in regard to speculation, but in regard to the permanent disposition of the fund, considering the probable income to be derived therefrom as well as the probable safety of their capital.

/ / /

187. Meketa's fiduciary duties extended (and continue to extend) to its performance of each of its obligations, including recommending investment allocations, monitoring investment performance of all investments, computing performance and returns of investments, and recommending divestment or termination of investments, along with all additional obligations imposed by contract.

188. Meketa breached its fiduciary duties by way of the conduct described throughout this Complaint, and by causing or contributing to millions of dollars of damages to the Plan's members.

189. Meketa's actions and inactions caused direct harm to each member of the Plaintiff Class by, *inter alia*, causing a portion of each Class Member's contributions to continue to be diverted to their ESPA (due to PERS remaining funded below 90% long after it should have been), thereby damaging the Plaintiff Class by reducing the amount of funds placed into each Class Member's defined contribution IAP account, receiving no additional benefit for the redirected funds, reducing the likely level of benefits available at retirement, and suffering additional financial losses.

190. The mere existence of a contract that was breached does not subsume or excuse Meketa's misfeasance in performing in a manner that violated the fiduciary duties that Meketa owed to the Plan and its members under Oregon law and public policy, the contract being merely the vehicle establishing the relationship of the parties during which a breach of fiduciary was committed.

191. Accordingly, Plaintiffs and the Class members are entitled to such equitable and remedial relief as this Court deems appropriate, including equitable relief to make the Plaintiffs and the Class members whole, as well as damages.

192. WHEREFORE, Plaintiffs and the Class demand judgment in their favor and against Meketa in an amount in excess of $5,000,000.00, exclusive of interest and costs, but together with damages, restitution, an accounting, disgorgement, consequential damages, lost investment returns, exemplary or punitive damages, equitable relief, injunctive relief, surcharge, lawful interest, attorneys' fees, costs of suit, and such other relief as the Court deems just and proper.

**-COUNT II-**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**

193. Plaintiffs incorporate by reference all preceding and subsequent allegations as if set forth herein. To the extent that any allegation is inconsistent with the allegations herein, this count is pleaded in the alternative.

194. As alleged above in detail, Meketa is and was an investment advisor and consultant that entered into a contract to provide expert professional services to the OIC. [**EXHIBIT 1,** *Meketa 2021 Contract*].

195. In providing services to OIC, Meketa was obligated to act at all times for the benefit of the Plan members, including Plaintiffs and the putative Plaintiff Class.

196. In fact, as made plain in the relevant contract, the Plan members, including Plaintiffs and the putative Plaintiff Class were the intended beneficiaries of all services to be rendered by Meketa to OIC and PERS.

197. The contract contains two provisions that are relevant to the third-party beneficiary analysis. First, **EXHIBIT 1**, Art. 17.7 provides that "Client and Consultant are the only parties to this Contract and are the only parties entitled to enforce the terms of this Contract. Nothing in this contract gives, or is intended to give, or may be construed to give or provide any benefit or right, whether directly, indirectly or otherwise, to third persons unless such third persons are individually

identified by name herein and expressly described as intended beneficiaries of the terms of this Contract."

198. However, **EXHIBIT 1**, Art. 8.3.2 makes clear that the Plaintiff Class are indeed identified third-party beneficiaries under the contract: "Consultant shall discharge its duties hereunder with respect to the Fund solely in the interest of the members, retirees and beneficiaries of the Fund."

199. The contract language thus demonstrates the intention of both parties to the contract (Meketa and OIC) to create a benefit for a third party (i.e. the Plan members, retirees and beneficiaries).

200. Plaintiffs and the putative Class are therefore third-party beneficiaries of the contract between Meketa and the OIC.

201. As detailed throughout this Complaint, Meketa breached its contractual and statutory obligations to the Plan members, including Plaintiffs and the putative Plaintiff Class, by all the ways set forth in this Complaint.

202. Meketa willingly entered into its contractual agreement with the OIC, and the consideration for the agreement paid to Meketa was, upon information and belief, paid from the Plan's assets.

203. Meketa's breaches proximately caused harm to the Plaintiffs and the putative Plaintiff Class; therefore Plaintiffs and the Class are entitled to damages.

204. WHEREFORE, Plaintiffs and the Class demand judgment in their favor and against Meketa in an amount in excess of $5,000,000.00, exclusive of interest and costs, but together with damages, restitution, an accounting, disgorgement, consequential damages, lost investment

returns, exemplary or punitive damages, equitable relief, injunctive relief, surcharge, lawful interest, attorneys' fees, costs of suit, and such other relief as the Court deems just and proper.

205. Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS, with respect to their Claims for Relief, pray the Court for a judgment as follows:

a. An order certifying the Class as defined above, appointing the Named Plaintiffs as class representatives, and appointing their counsel as Class Counsel;

b. An order declaring that Meketa Investment Group, Inc. owed fiduciary and third-party contractual obligations to the Class Members, breached those duties, and thereby caused injury and damage to the Class Members;

c. An order and judgment against Meketa Investment Group, Inc., awarding the Class damages in an amount exceeding $5,000,000.00 (not including interest and costs), restitution, an accounting, disgorgement, consequential damages, lost investment returns, exemplary or punitive damages, equitable relief, injunctive relief, lawful interest, and such other relief as the Court deems just and proper;

d. An award of attorneys' fees, costs of suit, disbursements, and expenses under applicable provisions;

e. Plaintiffs demand a jury trial; and

/ / /

/ / /

/ / /

/ / /

f. Such other and further relief that the Court deems reasonable and just.

DATED: November 3, 2026

LINDSAY HART, LLP

*/s/ Thomas E. McDermott*

Thomas E. McDermott, OSB #762430
Tyson L. Calvert, OSB #032809
**LINDSAY HART, LLP**
900 SW 5th Ave, Suite 2700
Portland, OR 97204-1206
tmcdermott@lindsayhart.com
tcalvert@lindsayhart.com
Telephone: 503.226.7677
Facsimile: 503.226.7697

*Attorneys for Plaintiffs and the Requested Class*